# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIANA CAMPUZANO,
AVI ELISHIS,
and GREGG SALZMAN,

        Plaintiffs,

        v.

THE ISLAMIC REPUBLIC OF IRAN
(aka Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF
INFORMATION AND SECURITY, and
THE IRANIAN REVOLUTIONARY GUARD,

        Defendants.

: Civil Action No.: 00-2328 (RMU) _ F./e

: Document No.:   30

**FILED**

**SEP 1 0 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JENNY RUBIN,
DEBORAH RUBIN,
DANIEL MILLER,
ABRAHAM MENDELSON,
STUART E. HERSH,
RENAY FRYM,
NOAM ROZENMAN,
ELENA ROZENMAN,
and TZVI ROZENMAN,

        Plaintiffs,

        v.

THE ISLAMIC REPUBLIC OF IRAN
(aka Iran, The Republic of Iran, Republic of Iran,
The Government of Iran, Iranian Government, and
Imperial Government of Iran),
THE IRANIAN MINISTRY OF
INFORMATION AND SECURITY,
AYATOLLAH ALI HOSEINI KHAMENEI,
ALI AKBAR HASHEMI-RAFSANJANI, and
ALI FALLAHIAN-KHUZESTANI,

        Defendants.

: Civil Action No.:  01-1655 (RMU)

: Document Nos.:   14, 20

(N l

51

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

On September 4, 1997, Hamas carried out a triple suicide bombing ("the bombing") at the crowded Ben Yehuda Street pedestrian mall in Jerusalem, Israel. The plaintiffs in these two consolidated actions are American citizens who were injured by the bombing. They allege that the defendants are responsible for the bombing because the defendants provided training and support to the terrorist group Hamas. Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, the plaintiffs seek compensatory and punitive damages for their personal injuries caused by the bombing.

These consolidated cases are before the court on the plaintiffs' motions for default judgment. Because the defendants failed to appear or respond to the plaintiffs' complaints, the Clerk of the Court entered defaults against them. Pursuant to the FSIA's hearing requirement, the court held a hearing from January 6 through January 9, 2003 to hear the plaintiffs' evidence. Based on its review of this evidence, the court makes the following findings of fact and conclusions of law and grants the plaintiffs' motions for default judgment.

### II. FINDINGS OF FACT

#### A. Procedural Background

1.      The *Campuzano* plaintiffs (Diana Campuzano, Avi Elishis, and Gregg Salzman) filed suit against defendants Islamic Republic of Iran ("Iran"), the Ministry of Information and Security ("MOIS"), and the Iranian Revolutionary Guards

("IRG") on September 9, 2000.  The *Rubin* plaintiffs (Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Hersh, Noam Rozenman, Deborah Rubin, Renay Frym, Elena Rozenman, and Tzvi Rozenman) filed suit against defendants Iran, MOIS, and senior Iranian officials Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani on July 31, 2001.  Despite being properly served with process pursuant to 28 U.S.C. § 1608, the defendants failed to respond or appear for either of these now-consolidated cases.

2.    The Clerk of the Court entered default against the *Campuzano* defendants on December 6, 2001 and against the *Rubin* defendants on March 6, 2002.  Because both cases arise out of the same terrorist bombing, the court consolidated the two cases for trial pursuant to Federal Rule of Civil Procedure 42(a).

3.    Despite the defendants' willful default, the court had to conduct an evidentiary hearing before it could enter a judgment by default against the defendants.  28 U.S.C. § 1608(e); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 6 (D.D.C. 1998).  Accordingly, the court held a hearing from January 6 through January 9, 2003.

**B.  The Bombing Incident**

4.    On the afternoon of September 4, 1997, three Hamas suicide bombers with cases of powerful explosive bombs arrived at the crowded Ben Yehuda Street pedestrian mall in downtown Jerusalem.  Trial Ex. ("Ex.") 28 at 1.  The bombers packed the bombs with nails, screws, pieces of glass, and chemical poisons to cause maximum pain, suffering, and death.  *Id.*

5.     The detonated bombs killed five people and wounded nearly two hundred others, including all three of the *Campuzano* plaintiffs and five of the *Rubin* plaintiffs. The plaintiffs injured by the detonated bombs are Diana Campuzano, Avi Elishis, Gregg Salzman, Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Hersh, and Noam Rozenman. Four of the *Rubin* plaintiffs, although not present at the bombing, were emotionally harmed as a result of the injury the caused to their family members. These four plaintiffs are Deborah Rubin, Renay Frym, Elena Rozenman, and Tzvi Rozenman.

6.     Israeli police arrested and charged two Hamas operatives, Muaid Said Bilal ("Bilal") and Omar Abdel Rahman al-Zaban ("Zaban") for participation in the bombing. Exs. 3 §§ 69-70, 7 § 27. An Israeli court subsequently convicted both Bilal and Zaban of multiple counts of murder, attempted murder, and active membership in Hamas. *Id.* Bilal, Zaban, and other members of their Hamas cell gave Israeli authorities a detailed account of the planning, funding and execution of the September 4, 1997 bombing. Trial Tr. ("Tr.") at 1/29-31; Exs. 3 §§ 70-71, 7 § 28.[1]

7.     Hamas claimed responsibility for the bombing. Tr. at 1/9, 1/27-29, 1/53; Exs. 3 § 69-83, 4 § 22, 7 § 26.

### C. The Relationship Between Iran and Hamas

8.     Hamas, an Islamic militant terrorist organization, has a close relationship with Iran. Tr. at 1/15; Exs. 3 § 14, 40 at 3, 56 at 5.

---

[1] References to the official trial transcript are to the day and page. In other words, "Tr. 1/29" denotes the trial transcript for day one of the trial at page 29.

9.    Iran provides ongoing terrorist training and economic assistance to Hamas.  Exs. 3, 4, 7 §§ 13-19, 56 at 9, 12.  Dr. Bruce Tefft, an expert in the field of terrorism, testified that Iran's support of Hamas was $30,000,000 in 1995.  Tr. at 1/17.  Another expert in terrorist activities, Dr. Patrick Clawson, testified that Iran supported Hamas with $20,000,000-50,000,000 annually over the past decade.  *Id.*

10.   Iran funnels much of its support to Hamas through MOIS, a ministry with approximately 30,000 employees and a budget of between $100,000,000 and $400,000,000.  Tr. at 1/78, 1/81; Ex. 4 § 33.  With Iranian government funds, MOIS "spends between $50,000,000 and $100,000,000 a year sponsoring terrorist activities of various organizations such as Hamas."  Tr. at 1/113.

11.   IRG is the military wing of MOIS.  Ex. 56 at 7-8.  Under the direction of MOIS, IRG provides professional military and terrorist training to Hamas operatives responsible for executing terrorist acts throughout the Middle East.  *Id.*; Ex. 3 § 32.  Dr. Tefft testified that IRG is MOIS's "action arm or paramilitary arm" responsible for "implementing the military or quasi-military actions abroad."  Tr. at 1/12.

12.   Iranian governmental support for terrorism is an official state policy and the approval of high-ranking Iranian officials, including Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani, and Ali Fallahian-Khuzestani, was necessary for Iran and MOIS to support Hamas with training and economic assistance.  Tr. at 1/34, 1/50-53, 1/80-81; Exs. 3 §§ 50-54, 4 §§ 18, 34.  Iran's support of Hamas could not have occurred without this senior leadership approval.  Exs. 3 § 50, 4 § 34.

13.     The bombing also would not have occurred without Iranian sponsorship.  Until

his death in November 2001, Hamas operative Mahmoud Abu Hanoud organized,

planned, and executed a large number of deadly terrorist bombings, including the

bombing at issue here.  Tr. at 1/44, 1/51, 1/64-70; Exs. 3 §§ 39, 57-63, 7 §§ 14-

18, 30.  Without the material support and resources the defendants provided to

Hamas, particularly the terrorist training of Hamas operative Mahmoud Abu

Hanoud, Hamas could not have carried out the bombing.  Tr. at 1/19-20, 1/71-72;

Exs. 3 §§ 58-59, 4 § 35, 7 § 38-40.

14.     Yigal Pressler, a counter-terrorism advisor to the Israeli prime minister who has

specialized in terrorism for 30 years, confirmed Iran's sponsorship, training and

economic support of Hamas.  Ex. 56 at 12.

15.     Since 1984, the U.S. Department of State has included Iran on its list of state

sponsors of terrorism.  Tr. at 1/76, Ex. 28 at 4.  According to the 1997 Global

Patterns report, Iran was the principal state sponsor of terrorism from 1996-1997.

*Id.*

### D.  The Plaintiffs

### 1.  The Plaintiffs Present at the Bombing

### (1)  Diana Campuzano

16.     Diana Campuzano is, and was at the time of the bombing, an American citizen.

Tr. at 2/8.

17.     Prior to her visit to Israel and the bombing, Ms. Campuzano worked as a sales

associate in a clothing store in New York, New York.  *Id.*

18.     After the bombing, Ms. Campuzano was taken to the emergency room at

Hadassah Hospital, where she arrived in a life-threatening condition. Ex. 64 at 22. She was completely disoriented, her skin was badly burned, her brain leaked cerebral spinal fluid from a massive skull fracture, and she was blind and hearing impaired. *Id*. at 22-24. She was hospitalized for about six weeks under the care of Dr. Sergey Spektor. Tr. at 2/13.

19.    A team of doctors performed a five-hour craniotomy on Ms. Campuzano to remove multiple bone fragments, repair the ruptures in her brain coverings, and repair her anterior skull base fracture with mini plates, bone cement, and her own harvested tissue. Exs. 64 at 25-27, 64B. Dr. Spektor testified to the delicacy of this surgery and explained that it "leaves people very exposed to Post-Traumatic Stress Disorder" ("PTSD").[2] *Id*. Ms. Campuzano's multiple wounds and burns complicated her recovery and caused a life-threatening infection to spread throughout her body. Ex. 64 at 27-28. Doctors administered heavy narcotics to her to reduce the pain. *Id*.

20.    Ms. Campuzano's permanent injuries include impaired vision, damage to the retina of her right eye, cataracts in both eyes, destroyed upper sinus cavity, loss of the ability to taste and smell, destroyed left eardrum. Tr. at 2/10-11; Exs. 62, 64 at 29-30, 64G. Photographs demonstrate the startling difference in her appearance before and after the explosion. Ex. 62.

21.    Dr. Lisa Mellman is a psychiatrist who has treated Ms. Campuzano since March

---

[2] PTSD is a condition that can result from exposure to life-threatening events. It is characterized by different symptoms including avoidance (the active escape from situations that the victim associates with the triggering event), re-experiencing (the re-living of the event), and hyper-vigilance (the inability to remain asleep, exaggerated startle response, and hallucinations). Tr. 4/43.

1999. Ex. 66 at 1-14. Dr. Mellman testified to Ms. Campuzano's diagnoses of depression and PTSD. *Id*. at 8-9. Also, Dr. Mellman testified that Ms. Campuzano exhibits high anxiety, easily startles, often feels irritable and isolated, and has difficulty sleeping. *Id*. Dr. Mellman prescribed a variety of medications and cognitive therapy, which improved some of Ms. Campuzano's symptoms, but not her emotional injuries. *Id*. at 10-15. Each new wave of terrorist activity in Israel or the United States causes a serious setback in Ms. Campuzano's recovery. *Id*. at 14. Ms. Campuzano also continues to suffer from a very poor self-image. *Id*. at 21-23. Dr. Mellman explained that Ms. Campuzano's depression and PTSD symptoms will likely continue. *Id*. at 23.

22.     After returning to the United States, Ms. Campuzano lived with her parents in Rochester, New York for about a year. Tr. at 2/14, 2/27-29. While seeking additional treatment for her vision and hearing and undergoing reconstructive surgery, she remained at home, often crying for hours. *Id*. Both parents testified to the startling change in her personality. Tr. at 2/25-30. When Ms. Campuzano returned to Manhattan after living with her parents, she encountered a number of difficulties in adjusting to life away from her parents. Tr. at 2/17-20. Although she works part-time as a volunteer secretary at a nearby synagogue, she remains unable to resume full-time employment. Tr. at 2/17-18. She does not feel able to leave her neighborhood for more than three hours, and she does not like to leave home after 8:00 p.m. Tr. at 2/19. She is easily exhausted. Tr. at 2/20. According to Dr. Mellman, Ms. Campuzano cannot resume full-time employment or any job that involves contact with strangers or accomplishing multiple tasks. Ex. 66 at

15-16.

23.    John Devlin, CPA, provided expert testimony and analysis of Ms. Campuzano's

loss of future income. Tr. at 2/31-40. After reviewing her tax returns filed prior

to the bombing and her earnings from her current part-time volunteer position,

Mr. Devlin opined that the present value of Ms. Campuzano's loss of future

earnings is $1,952,725. *Id.* at 37.

**(2) Avi Elishis**

24.    Avi Elishis is, and was at the time of the bombing, an American citizen. Tr. at

1/84.

25.    At the time of the bombing, Mr. Elishis was eighteen years old, had recently

finished high school, and was spending a year in Israel. *Id.*

26.    After the bombing, an ambulance took Mr. Elishis to Bikur-Cholim Hospital

where doctors removed a two-inch screw from his spleen. Tr. at 3/87. He

suffered from lacerations and multiple entry wounds from the bomb shrapnel, a

ruptured eardrum, and first- and second-degree burns covering his body. Ex. 61

at 4-7. The bleeding from these injuries caused him to go into shock. Tr. at 2/86;

Ex. 61 at 3.

27.    Mr. Elishis was transferred to another hospital, Hadassah Einkarem, where he

arrived in critical condition, for further treatment of extensive injuries to his

shrapnel-perforated lung and emergency surgery to remove three screws lodged

next to his heart. Tr. at 1/88; Ex. 61. He underwent urgent surgery for removal of

screws in his spleen that caused bleeding into his abdomen. Ex. 61 at 3. Dr. Eli

Milgalter, a senior cardiac thoracic surgeon at Hadassah Medical Center, treated

Mr. Elishis for about one month.  *Id.* at 5.

28.     Mr. Elishis's multiple wounds and burns complicated his recovery, and his
        extremely painful burn treatment lasted 23 months.  Tr. at 1/90-91.  He also
        underwent additional surgery to remove a bolt from his foot.  *Id.*

29.     Mr. Elishis has a permanent limp in his left leg, experiences difficulty breathing,
        suffers from pain in his abdomen and chest wall, has problematic bowel
        movements, has permanent cardiovascular limitations because of his perforated
        lung, has a permanent 50 percent loss of hearing and a constant ringing in his left
        eardrum, experiences numbness or hypersensitive in parts of his body because of
        the permanent and severe scars, and one screw remains lodged under his rib.  Tr.
        at 1/88, 1/90; Ex. 61 at 4-7.

30.     Mr. Elishis also received psychiatric treatment while hospitalized in Israel, but did
        not receive further psychiatric treatment in the United States because he could not
        bear to re-live the experience of the bombing.  Tr. at 1/95-96; Ex. 61 at 4-7.  Mr.
        Elishis and his mother testified regarding his personality changes: he now avoids
        crowds, is easily startled by loud noises, and is easily irritated.  Tr. at 1/97, 1/110-
        11.  Also, Mr. Elishis exhibits common symptoms of PTSD, including a fear of
        large crowds, heightened sensitivity to sudden and loud noises, nervousness,
        irritability, emotional reactions to news of other terrorist attacks, and depression.
        Tr. at 1/111-12.

31.     After he returned to his family in New York, Mr. Elishis received medical
        treatment for removal of additional shrapnel, laser surgery for burn scars,
        surgical repair to his eardrum, and dermatology treatment.  Exs. 59a-59c.  Mr.

Elishis's mother paid $10,882.87 for his medical treatment.  Ex. 59; Tr. at 1/111.

### (3)  Gregg Salzman

32.  Gregg Salzman is, and was at the time of the bombing, an American citizen.  Tr. at 1/114.

33.  Before the bombing, Mr. Salzman worked as a chiropractor.  *Id.*

34.  After the bombing, Mr. Salzman spent eight days at Shaarei Zedek Hospital for treatment of his first- and second-degree burns, a perforated eardrum, and wounds from shrapnel that struck him in the midline of his upper lip below his nose.  Tr. at 1/117.

35.  Mr. Salzman has permanent nerve injury from the shrapnel wound to his upper lip.  Tr. at 1/118.  Treatment for his wound included root canals, tooth extractions and a titanium implant in his gums.  Tr. at 1/118-23; Exs. 67A-E.  Dr. Keith Hope, a dental specialist in endodontics at Hadassah Hospital, testified that the palliative care for Mr. Salzman is ineffective and the trauma of the shrapnel caused further nerve damage to surrounding tissue.  Ex. 68.  Dr. Hope explained that there is no practical treatment for Mr. Salzman's injuries "because now the nerve damage is in the brain, not at the site of injury."  *Id.* at 5, 7.

36.  Dr. Hope also testified that the only treatment available to Mr. Salzman is "psychological counseling or pain counseling.  He will just live with this pain."  *Id.*  Dr. Sam Strauss, also a dental specialist in endodontics, confirmed this prognosis and concluded that Mr. Salzman suffers from a permanent disability that will forever impact his personal and professional life.  Ex. 67e at 3.

37.  Although Mr. Salzman still is able to work as a chiropractor, he works shortened

days and has debilitating headaches.  Tr. at 1/123.  He suffers from PTSD and experiences constant physical pain.  Tr. at 1/123-24.

### (4) Jenny Rubin

38.     Jenny Rubin is, and was at the time of the bombing, an American citizen.  Tr. at 3/38.

39.     At the time of the bombing, Ms. Rubin was 16 years old.  Tr. at 3/26, 3/39.

40.     After the bombing, Ms. Rubin was taken to a hospital.  Tr. at 3/18.  Because she had no obvious physical injuries, the hospital released her to her mother's care. *Id.*

41.     Ms. Rubin has permanent tinnitus, a constant ringing or buzzing sound, which disrupts concentration and her ability to think and sleep.  *Id.*  As a result, Ms. Rubin's concentration and memory are permanently impaired.  Tr. at 3/126.

42.     Ms. Rubin received psychiatric treatment for her emotional injuries.  Tr. at 3/24-25.  She was diagnosed with elective mutism, a psychiatric brain condition.  Tr. at 3/122.  Ms. Rubin and her mother testified about Ms. Rubin's personality changes.  Tr. at 3/30-32.  Dr. Edgar Garcia-Rill, an expert in the field of neuro-physiology and the pathophysiology of PTSD, testified that because of the bombing, Ms. Rubin exhibits common symptoms of PTSD including paranoia, fear, emotional reactions to news of other terrorist attacks, and depression.  Tr. at 3/54-56.

### (5) Daniel Miller

43.     Daniel Miller is, and was at the time of the bombing, an American citizen.  Tr. at 4/2.

44.     At the time of the bombing, Mr. Miller had just graduated from high school.  Tr. at 4/3.

45.     After the bombing, Mr. Miller was taken to a nearby hospital.  Tr. at 4/11.  He had multiple shrapnel-caused entry wounds in his legs, had a piece of glass in his left eye, and could not move his right leg.  Tr. at 4/12.

46.     Mr. Miller spent five hours in extreme pain as he waited for doctors to see him at the hospital.  Tr. at 4/11.  Doctors performed surgery to remove a spike in his left leg, and bolts and nuts in both ankles.  Tr. at 4/12.  Days later, doctors performed surgery to remove the glass from his eye.  Tr. at 4/15.  He spent one week in the hospital, followed by one month of physical therapy.  Tr. at 4/13, 4/16-17.

47.     Mr. Miller's permanent injuries include a permanent limp in his right leg, numbing and tingling in his right foot, a hematoma in his left leg, nerve damage to his fingers and hands, hypersensitivity to sunlight, and a heightened risk of glaucoma.  Tr. at 3/29, 3/115-21.  He is also unable to walk more than 20 minutes at a time.  Tr. at 3/116.

48.     Dr. Lee Pravda, a psychiatrist, diagnosed Mr. Miller with PTSD.  Ex. 10 at 4.  Mr. Miller exhibits symptoms of PTSD including hyper vigilance, re-experiencing of the bombing and emotional reactions to news of other terrorist attacks.  Tr. at 4/82-83.  Dr. Garcia-Rill testified that Mr. Miller's emotional injuries are permanent.  Tr. at 4/84.

### (6) Abraham Mendelson

49.     Abraham Mendelson is, and was at the time of the bombing, an American citizen. Tr. at 3/70.

50.     At the time of the bombing, Mr. Mendelson was a studying in Jerusalem.  Tr. at
        3/71-72.

51.     After the bombing, Mr. Mendelson was taken to a hospital.  Tr. at 3/84.  He had
        multiple shrapnel-caused entry wounds in his legs, burns that included a burned
        cornea, and a partially-severed ear.  Tr. at 3/84-86.

52.     Mr. Mendelson spent nine hours in extreme pain as he waited for doctors to see
        him at the hospital.  Tr. at 4/11.  He spent four days in the hospital for treatment
        of his injuries, and he continued his self-performed burn therapy after leaving the
        hospital.  Tr. at 3/86-88.

53.     Mr. Mendelson's permanent injuries include a perforated right eardrum, a
        partially-severed ear, partial hearing loss, tinnitus, large scars, and chronic
        headaches.  Tr. at 3/85-86, 3/107-11.

54.     Dr. C. Scott Saunders, a psychiatrist, diagnosed Mr. Mendelson with chronic
        PTSD.  Ex. 9 at 2.  Dr. Garcia-Rill confirmed this diagnosis and testified that Mr.
        Mendelson exhibits sleep disorganization and sleep deficit, both of which are
        symptoms of PTSD.  Tr. at 4/80.  Dr. Garcia-Rill also stated that Mr. Mendelson's
        emotional injuries are permanent.  *Id*. at 83.

### (7) Stuart Hersh

55.     Stuart Hersh is, and was at the time of the bombing, an American citizen.  Tr. at
        3/85-86.

56.     After the bombing, Mr. Hersh spent one day in a hospital for treatment of multiple
        shrapnel-caused entry wounds and burns.  Tr. at 2/98-99.

57.     One year after the bombing, Mr. Hersh attempted to commit suicide.  Tr. at 2/100,

3/8; Ex. 12.  He was in his room contemplating suicide with a loaded handgun for an hour before the police intervened.  *Id.*  His social worker Gershom Goldman, also intervened and stated that his "nightmares and other problems arising from his PTSD had become overwhelming . . . . "  *Id.*

58.  Mr. Hersh's permanent injuries include 60 percent hearing loss, tinnitus, back pain, chronic ear infections, burn scars, and difficulty walking.  Tr. at 3/96, 3/135-37.

59.  Mr. Hersh also has chronic PTSD.  Ex. 11.  Mr. Hersh exhibits symptoms common to PTSD, including irritability, insomnia, anger, frustration, flashbacks, nightmares, and depression.  *Id.*  Dr. Garcia-Rill testified that Mr. Hersh's post-bombing suicide attempt was a result of his emotional instability.  Tr. at 4/79-80.  Dr. Garcia-Rill also testified that Mr. Hersh has permanent psychomotor retardation, a speech impediment.  *Id.*

### (8)  Noam Rozenman

60.  Noam Rozenman is, and was at the time of the bombing, an American citizen.  Tr. at 2/43.

61.  At the time of the bombing, Mr. Rozenman was a junior in high school.  *Id.*

62.  After the bombing, Mr. Rozenman was taken to a hospital.  Tr. at 2/50.  He had burns covering 40 percent of his body and over 100 shrapnel-caused entry wounds.  *Id.*

63.  Mr. Rozenman underwent surgery to remove the shrapnel and for treatment of his burns.  Tr. at 2/51-52.  He spent six weeks in the hospital and underwent daily burn treatments.  Tr. at 2/55-56.  His burn recovery period was twice the normal

length because the chemicals inside the bombs caused increased body damage. Tr. at 2/58. After his release from the hospital, he spent two weeks in a rehabilitation center where he learned to walk on crutches. Tr. at 2/60. He had physical and occupational therapy for an additional month. *Id.* A year later, Mr. Rozenman had additional surgery to adjust a steel plate in his leg and to treat his perforated eardrums. Tr. at 2/68.

64.    Mr. Rozenman has permanent injuries including tinnitus, perforated eardrums, chronic ear infections, scars, and nerve damage in his left leg and right hand. Tr. at 2/127-30. His motor skills are permanently impaired and he walks with a limp because one leg is permanently shorter than the other. *Id.*

65.    Dr. Garcia-Rill testified that Mr. Rozenman suffers from permanent PTSD and exhibits irritability, aggression, avoidance, re-experiencing of the bombing, and depression. Tr. at 4/85-86. His emotional injuries are the most severe of all the *Rubin* plaintiffs, according to Dr. Garcia-Rill. *Id.*

66.    Mr. Rozenman was unable to appear at the trial. His psychiatrist, Dr. Rael Strous explained that his "mental status remains very 'fragile'" and that "it would be clinically inadvisable" for Noam to testify. Tr. At 2/43; Ex. 13. Both Dr. Strous and Mr. Rozenman's mother indicated that testifying could cause him to suffer a psychological relapse. *Id.*

### 2. The Plaintiffs Not Present at the Bombing

#### (1) Deborah Rubin

67.    Deborah Rubin is, and was at the time of the bombing, an American citizen. Tr. at 3/15.

68.   Ms. Rubin is plaintiff Jenny Rubin's mother.  *Id.*

69.   Since the bombing, Ms. Rubin has dedicated her time and effort to care for her daughter.  Tr. at 3/27-35.

70.   As a result of her daughter's injuries from the bombing, she suffers from grief, anguish, and depression.  *Id.*

### (2) Renay Frym

71.   Renay Frym is, and was at the time of the bombing, an American citizen.  Tr. at 3/2.

72.   Ms. Frym is plaintiff Stuart Hersh's wife.  *Id.*

73.   As a result of her husband's injuries from the bombing, Ms. Frym's relationship with her husband has changed completely, as she now acts as his nurse rather than as his wife.  Tr. at 2/98, 3/12.  She suffers from grief and anguish, specifically including anxiety, frustration, and irritability.  *Id.*

### (3) Elena Rozenman

74.   Elena Rozenman is, and was at the time of the bombing, an American citizen.  Tr. at 2/43.

75.   Ms. Rozenman is plaintiff Noam Rozenman's mother.  *Id.*

76.   After the bombing, Ms. Rozenman went to the hospital where she saw her son in pain and anguish from his injuries.  Tr. at 2/48-49.  Since her son's release from the hospital, Ms. Rozenman has dedicated her time and effort to care for her son. Tr. at 2/49-59.

77.   As a result of her son's injuries, Ms. Rozenman suffers from grief and anguish, specifically including chronic fatigue headaches, agitation, rejection, and

hypersensitivity.  Tr. at 2/2-3.  Dr. Strous testified that Ms. Rozenman's
emotional injuries have led to physical injuries, including irritable bowel
syndrome and generalized joint pain and stiffness.  *Id*.

### (4)  Tzvi Rozenman

78.   Tzvi Rozenman is, and was at the time of the bombing, an American citizen.  Tr.
        at 2/78.

79.   Mr. Rozenman is plaintiff Noam Rozenman's father.  *Id*.

80.   Since the bombing, Mr. Rozenman has dedicated his time and effort to care for
        his son.  Tr. at 2/81.

81.   Mr. Rozenman suffers from grief and anguish caused by his son's injuries.  Ex.
        13.

## II.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Liability

#### 1.  Legal Standard for a Default Judgment

A court shall not enter a default judgment against a foreign state "unless the
claimant establishes his claim or right to relief by evidence satisfactory to the court."  28
U.S.C. § 1608(e); *Roeder v. Islamic Republic of Iran*, 2003 WL 21495185, at *3 (D.C.
Cir. July 1, 2003).  This "satisfactory to the court" standard is identical to the standard for
entry of default judgments against the United States in Federal Rule of Civil Procedure

55(e).[3] *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  In evaluating the

plaintiffs' proof, the court may "accept as true the plaintiffs' uncontroverted evidence."

*Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000).  In FSIA

default judgment proceedings, the plaintiffs may establish proof by affidavit.  *Weinstein*

*v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### 2. Legal Standard for Subject-Matter Jurisdiction and Liability

In order to establish subject-matter jurisdiction, the plaintiffs must establish an

exception to the defendant foreign state's sovereign immunity.  28 U.S.C. §§ 1604,

1605(a)(7).  The Antiterrorism and Effective Death Penalty Act of 1996 amended the

FSIA and waived the sovereign immunity of state sponsors of terrorism.  28 U.S.C. §

1605(a)(7); *Elahi*, 124 F. Supp. 2d at 107.  When an exception to sovereign immunity

exists under 28 U.S.C. § 1605(a)(7), this court has original subject-matter jurisdiction

pursuant to 28 U.S.C. § 1330(a).  *Argentine Republic v. Amerada Hess Shipping Corp.*,

488 U.S. 428, 435 (1989); *Elahi*, 124 F. Supp. 2d at 106.

Creating a cause of action for victims of terrorism, Congress amended the FSIA

with the Civil Liability for Acts of State Sponsored Terrorism Act, commonly known as

the Flatow Amendment.  28 U.S.C. § 1605 note; *Roeder*, 2003 WL 21495184, at *1.

Thus, to establish subject-matter jurisdiction and prove liability pursuant to the FSIA and

its amendments, the plaintiffs must prove with "evidence satisfactory to the court" the

following applicable elements:

> (1) that personal injury or death resulted from an act of torture, extrajudicial
> killing, aircraft sabotage, or hostage taking;

---

[3]  Rule 55(e) states that no "default [judgment] shall be entered against the United States or an officer or agency thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  FED. R. CIV. P. 55(e).

(2) that the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant;

(3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within the scope of his or her office, agency, or employment;

(4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act;

(5) that if the incident complained of occurred within the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter;

(6) that either the plaintiff or the victim was a United States national at the time of the incident;

(7) that similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C. §§ 1605(a)(7) and 1605 note; *Peterson v. Islamic Republic of Iran*, 2003 WL 21251867, at *11-12 (D.D.C. May 30, 2003); *Elahi*, 124 F. Supp. 2d at 106-07.

### 3. Conclusions of Law Regarding Subject-Matter Jurisdiction and Liability

In accordance with the D.C. Circuit, the court applies the Rule 55(e) standard to determine whether the plaintiffs satisfied their burden of proof pursuant to 28 U.S.C. § 1608(e). *Hill*, 328 F.3d at 683. The court concludes that default judgment for the plaintiffs is proper because they have proven each of the applicable elements by "evidence satisfactory to the court." *Peterson*, 2003 WL 21251867, at *11-12. Indeed, the court concludes that the plaintiffs have gone beyond the necessary burden of "evidence satisfactory to the court" and have proven each element by clear and convincing evidence. *Hill*, 328 F.3d at 683.

Considering the first of the FSIA elements, the court determines that the bombing

was an act of extrajudicial killing that caused the plaintiffs' injuries.[4] 28 U.S.C. §§ 1605(a)(7) and 1605 note.  Other members of this court have previously determined that a deadly terrorist attack is an act of extrajudicial killing.  *Flatow*, 999 F. Supp. at 18 (holding that "a suicide bombing . . . is an act of 'extrajudicial killing' within the meaning of 28 U.S.C. § 1605(a)(7)"); *Elahi*, 124 F. Supp. 2d at 107 (same).  Further, the bombing was a deliberate killing not authorized by a previous judgment.  28 U.S.C. § 1350 note.

Addressing the second FSIA element, the court determines that Hamas, a non-state actor that receives material support and resources from Iran, deliberately detonated the September 4, 1997 bombs at the Ben Yehuda Street pedestrian mall in Jerusalem.  28 U.S.C. §§ 1605(a)(7) and 1605 note.  Iran directly provided material support and resources to Hamas and its operatives, for the specific purpose of carrying out acts of extrajudicial killing, including the bombing at issue here.  *Cf. Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 97-98 (D.D.C. 2002) (ruling that the plaintiffs failed to establish a connection between the terrorists and Iran sufficient to satisfy the requirements of section 1605(a)(7)).

Regarding the third element, the court determines that MOIS, an agency of the government of Iran, and senior Iranian officials Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani provided "material support or resources" to Hamas and its operatives, for the specific purpose of carrying out the bombing, an act of extrajudicial killing.  28 U.S.C. §§ 1605(a)(7) and 1605 note.

---

[4] Section 1605(e)(1) adopts the definition of extrajudicial killing contained in the Torture Victim Protection Act of 1991: "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. §1350 note.

Because providing material support and resources to Hamas is part of official Iranian policy, MOIS and the Iranian leaders acted within the scope of their office, agency, and employment.

Turning to the fourth and fifth elements, the court determines that Iran was a designated state sponsor of terrorism on September 4, 1997. *Id.* Also, the FSIA does not require the plaintiffs to offer the defendants an opportunity to arbitrate because the attack did not occur within Iranian territory. *Id.* Addressing the sixth element, the court determines that the plaintiffs were United States citizens on September 4, 1997, the date of the bombing. *Id.* Considering the seventh element, the court concludes that if an official of the United States, acting in his or her official capacity, provided material support to an organization similar to Hamas in order to cause or facilitate terrorist attacks, he or she would be held liable and unable to claim a defense of immunity. *Id.*; *Elahi*, 124 F. Supp. 2d at 108.

Having met all of the requisite elements, the court concludes that the plaintiffs have established, by the requisite "evidence satisfactory to the court" and by clear and convincing evidence, the court's subject-matter jurisdiction and the liability of the defendants for the plaintiffs' personal injuries caused by the September 4, 1997 bombing. *Id.*

One final point regarding liability merits attention.  In addition to their claim for liability pursuant to the FSIA, specifically, the Flatow Amendment, the *Rubin* plaintiffs also claim liability pursuant to common law for the torts of assault, battery, and intentional infliction of emotional distress and present proposed conclusions of law for

these claims.[5]  *Rubin* Pls.' Prop. Findings of Fact and Conclusions of Law at 22-46.

However, the *Rubin* plaintiffs' proposed findings of fact and conclusions of law leave

unclear whether they included their common law causes of action as an alternative or

additional theory of liability.  *Id.*  Because the court has concluded that the defendants are

liable for the personal injuries caused to the plaintiffs by the defendants' actions, the

analysis of these claims is redundant with the FSIA liability analysis.  Nevertheless, out

of an abundance of caution, the court will briefly address the common law claims, which

are valid claims that the plaintiffs have proven.

The *Rubin* plaintiffs' evidence of the bombing and their resultant physical and

emotional injuries supports their claims that the defendants are liable for the torts of

battery, assault, and intentional infliction of emotional distress against plaintiffs Jenny

Rubin, Daniel Miller, Abraham Mendelson, Stuart Elliot Hersh and Noam Rozenman.

*E.g., Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 47-50 (D.D.C. 2001)

(ruling that Iran and MOIS were liable for the common law torts of battery, assault, and

intentional infliction of emotional distress due to actions by a terrorist group they funded

and supported); *Jenco*, 154 F. Supp. 2d at 33-36 (same).  In addition, the *Rubin* plaintiff's

evidence of the bombing, their resultant emotion distress, and the immediate family

---

[5] In contrast, the *Campuzano* plaintiffs limit their proposed conclusions of law to liability
pursuant to the FSIA and the Flatow amendment.  *Campuzano* Pls.' Prop. Findings of Fact and
Conclusions of Law at 22-29.  While many FSIA judgments have founded liability on the FSIA
and the Flatow Amendment alone, some have instead founded liability on common law causes of
action including assault, battery, and intentional infliction of emotional distress.  *Compare, e.g.,*
*Elahi,* 124 F. Supp. 2d at 106-08 (basing liability on the FSIA and the Flatow amendment) *and*
*Mousa v. Islamic Republic of Iran,* 2001 U.S. Dist. LEXIS 24316, at *28-29 (D.D.C. Sept. 19,
2001) (same) *with, e.g., Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 332 (D.C. Cir. 2003)
(affirming district court's application of common law to the plaintiffs' claims for intentional
infliction of emotional distress) *and Jenco v. Islamic Republic of Iran,* 154 F. Supp. 2d 27, 38
(D.D.C. 2001) (determining that the defendants were liable pursuant to the plaintiff's common
law claims for battery, assault, and intentional infliction of emotional distress).

relationships between the plaintiffs present at the bombing and those not present supports their claims that the defendants are liable for intentionally inflicting emotional distress on plaintiffs Deborah Rubin, Renay Frym, Elana Rozenman and Tzvi Rozenman. *E.g.,* *Sutherland*, 151 F. Supp. 2d at 49-50 (holding that Iran and MOIS were liable for the intentional infliction of emotional distress of plaintiffs who did not witness the terrorist act but whose immediate family members did); *Jenco*, 154 F. Supp. 2d at 35-36 (same). For these reasons, the court concludes that the defendants are liable to the *Rubin* plaintiffs for the common law torts of assault, battery, and intentional infliction of emotional distress.

### 4. Personal Jurisdiction

The FSIA provides that personal jurisdiction over a foreign-state defendant exists once the plaintiff establishes an exception to immunity pursuant to 28 U.S.C. § 1605 and accomplishes service of process pursuant to 28 U.S.C. § 1608.  28 U.S.C. §§ 1330(b), 1605, 1608; *Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438, 442 (D.C. Cir. 1990) ("Personal jurisdiction under FSIA exists so long as subject-matter jurisdiction exists and service has been properly made pursuant to 28 U.S.C. § 1608") (citing 28 U.S.C. § 1330(b)).  Accordingly, because the plaintiffs have established an exception to the defendants' immunity pursuant to 28 U.S.C. § 1605 and thereby established subject matter jurisdiction, and because the plaintiffs properly served the defendants pursuant to 28 U.S.C. § 1608, the court has personal jurisdiction over the defendants. *Foremost-McKesson*, 905 F.2d at 442.

### B. Compensatory Damages

### 1. Legal Standard for Compensatory Damages

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill*, 328 F.3d at 684-85 (citation omitted). Plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a reasonable estimate. *Id.* For the court to award damages for past economic losses, plaintiffs need only "reasonably prove" the amount of damages they request and the court should consider any "special problems of proof arising from the defendant's absence." *Id.*

Using this framework, the court considers whether the following types of compensatory damages are available: pain and suffering, loss of prospective income, medical expenses, and solatium.   While all of the plaintiffs present at the bombing request pain and suffering damages and all of the plaintiffs not present at the bombing request solatium damages, only Diana Campuzano requests damages for lost future wages and only Avi Elishis requests damages for past medical expenses.

### a. Pain and Suffering

In considering the plaintiff's requests for pain and suffering damages, the court follows the rationale used in other FSIA cases in which other members of this court have looked to previous decisions to calculate damages for the pain and suffering caused by Iran-sponsored terrorist acts. *E.g.*, *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234-35 (D.D.C. 2002). The case most similar to the instant case, and therefore most helpful for the calculation of pain and suffering damages, is *Mousa v. Islamic Republic of*

25

*Iran.* 2001 U.S. Dist. LEXIS 24316. Unlike most FSIA plaintiffs who were either killed or held as hostages, but similar to the plaintiffs in this action, Ms. Mousa survived a terrorist bombing and was not a hostage. *Id.* at *30-33 (discussing damage awards in other FSIA cases).

The plaintiff in *Mousa* survived a suicide bombing of a bus in Israel and suffered from severe burns and blast injuries to her lungs, skull, face, and hand. *Id.* at *10. Ms. Mousa was hospitalized for about four weeks, spent another nine days at a rehabilitation center, and received continuous treatment for about three months thereafter. *Id.* at *31. Ms. Mousa suffers from numerous permanent injuries including hearing loss, blindness in one eye, loss of function in her dominant hand, disfigurement, burn scars, concentration problems, walking difficulties, breathing impairment, and PTSD. *Id.* at *10-14. The court awarded Ms. Mousa $12,000,000 in compensatory damages for past and future pain and suffering because the plaintiff suffered at the time of the attack and, as a survivor, continues to suffer from her permanent injuries. *Id.* at *33. The court explained that "[a]lthough not held hostage in the traditional sense of that phrase, the person of Ms. Mousa was misappropriated by [the] defendants – by means of horrible, violent injuries – to make a political statement, and has thus been held hostage in mind and body by the Iran-sponsored terrorists for nearly six years, with no hope of relief from that captivity for the rest of her life."

### b. Loss of Prospective Income

The FSIA also permits compensatory damages when plaintiffs' terrorist-caused injuries prohibit them from working. *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 26 (D.D.C. 2001). In *Daliberti*, the court awarded damages for loss of prospective

income pursuant to the FSIA because the plaintiffs were unable to continue their previous employment due to psychological and emotional injuries caused by a terrorist act for which the defendants were responsible. *Id.*

### c. Medical Expenses

Pursuant to the FSIA, economic expenses of terrorist-caused personal injury are compensable. 28 U.S.C. § 1605 note. Although no previous FSIA cases include claims for medical expenses, the court in *Mousa* noted that medical expenses are compensable under the FSIA's "economic damages" provision. 2001 U.S. Dist. LEXIS 24316, at *29-30 (listing all the claims the plaintiff did not make, but could have made).

### d. Solatium Damages

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to plaintiffs closely related to a victim of terrorism. *E.g.*, *Flatow*, 999 F. Supp. at 29; *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269-70 (D.D.C. 2002). "[A]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror[.]" *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 78, 89 (D.D.C. 2002). As with pain and suffering damages, courts in this circuit have a well-established practice of looking to previous solatium awards to determine solatium damages in FSIA cases. *Hill*, 175 F. Supp. 2d at 48; *Jenco*, 154 F. Supp. 2d at 38.

Courts have recognized the distress of parents whose children are victims of terrorist acts by awarding solatium damages to the parents of terrorism victims. *Stethem*, 201 F. Supp. at 89; *Acree v. Republic of Iraq*, 2003 WL 21537919, at *43 (D.D.C. July 7, 2003); *Stethem*, 201 F. Supp. 2d at 91. In *Stethem*, the court awarded $5,000,000 in

solatium damages to the parent of a plaintiff killed by terrorists for the parents' grief and
mental anguish suffered as a result of the terrorist-caused injuries to their child. *Stethem*,
201 F. Supp. 2d at 91. Following *Stethem*, the court in *Acree* awarded $5,000,000 in
solatium damages to the parents of surviving terrorism victims for their grief and mental
anguish. *Acree*, 2003 WL 21537919, at *43. In *Acree*, the victims were held hostage for
periods of time ranging from one week to over six weeks. 2003 WL 21537919, at *3-31.
During their childrens' captivity, the parents suffered extreme emotional distress. *Id.* at
*31. After the release of the hostages and the families' reunions, the parents continued to
suffer because of the changed physical and emotional conditions of their children. *Id.* at
*31-32. The *Acree* court distinguished the parents' suffering during the captivity and
post-release by awarding them $2,500,000 "for the mental anguish and emotional distress
during the period of their loved ones' captivity" and an additional $2,500,000 "for their
mental anguish, emotional distress, and any economic damage" after the release of the
hostages. *Id.* at *43.

Courts have also recognized the distress of spouses of terrorism victims by
awarding solatium damages to such spouses. *Acree*, 2003 WL 21537919, at *42-43;
*Weinstein*, 184 F. Supp. 2d at 23; *Higgins v. Islamic Republic of Iran*, 2000 WL
33674311, at *7-8 (D.D.C. Sept. 21, 2000); *Cicippio v. Islamic Republic of Iran*, 18 F.
Supp. 2d 62, 65-67 (D.D.C. 1998). In *Weinstein* and *Higgins*, both cases in which
terrorists killed the plaintiffs, the courts awarded $8,000,000 and $12,000,000
respectively, in solatium damages to the plaintiffs' spouses. *Weinstein*, 184 F. Supp. 2d
at 23; *Higgins*, 2000 WL 33674311, at *7-8. In *Cicippio*, the court awarded $10,000,000
in solatium damages to each surviving hostage victim's spouse for the mental anguish

endured while separated and for the spouses' continuing mental anguish suffered upon the return of the victims due to the terrorist-caused injuries. *Cicippio*, 18 F. Supp. at 65-67. The *Cicippio* court specifically stated that the spouses' suffering "may have exceeded the grief normally experienced as a result of the death of a loved one, and will in all likelihood continue to do so into an uncertain future." *Id*. at 70. Following similar analysis, this court awarded $10,000,000 in solatium damages to each surviving terrorism victims' spouse in *Acree*. 2003 WL 21537919, at *42-43. Again, the court in *Acree* distinguished between suffering during captivity and post-release by awarding $4,000,000 "for the mental anguish and emotional distress during the period of a husband's captivity" and $6,000,000 "for mental anguish and emotional distress following a husband's release." *Id*. at *43.

### 2. Conclusions of Law Regarding Compensatory Damages

In considering the plaintiffs' claims for past damages, the court concludes that the plaintiffs have "reasonably proven" their claims. *Hill*, 328 F.3d at 684-85. Similarly, in considering the plaintiffs' claims for future damages, the court concludes that the plaintiffs have proven their claims by a "reasonable certainty." Accordingly, the plaintiffs are entitled to damage awards as set forth below. *Id*.

### a. The Plaintiffs Present at the Bombing

The plaintiffs present at the bombing were severely and permanently injured as a result of the Iran-sponsored bombing. Because the nature and duration of the plaintiffs' pain and suffering is comparable to the pain and suffering experienced by the *Mousa* plaintiff, this court follows the analysis and guidance of the *Mousa* court in determining

the amount of the plaintiffs' damages awards. *Mousa*, 2001 U.S. Dist. LEXIS 24316, at
*30-33.

### (1) Diana Campuzano

Overall and of most significance to this analysis, Ms. Campuzano's severe burns,
skull injuries, scarring, permanent vision and hearing impairments, and PTSD symptoms
are similar to those of Ms. Mousa. *Id*. at *10-14.  Contrasting Ms. Campuzano to the
plaintiff in *Mousa*, however, the court determines that Ms. Campuzano's pain and
suffering is more severe in that Ms. Campuzano's injuries are slightly more serious and
she was hospitalized for two weeks longer than Ms. Mousa. *Id*. at *11.  Taking into
account the similarities and differences between the injuries of Ms. Mousa and Ms.
Campuzano, and the $12,000,000 compensatory damages award to Ms. Mousa, the court
concludes that Ms. Campuzano is entitled to recover compensatory damages for her past
and future pain and suffering in the amount of $17,000,000. *Id*. at *33.

In addition, Ms. Campuzano's expert testimony proved that her loss of
prospective income, as caused by her inability to work because of her emotional and
psychological injuries, entitles her to an award of $1,952,725 for loss of prospective
income. *Daliberti*, 146 F. Supp. 2d at 26.

### (2) Avi Elishis

Similar to Ms. Mousa, Mr. Elishis was hospitalized for about four weeks, suffered
severe burns and blast injuries, scarring, and has permanent hearing loss, walking
difficulties, difficulty breathing, and PTSD. *Mousa*, at *10-14.  Because of the severity
and permanence of his injuries, and because of the similar degree of pain and suffering
between the plaintiff in *Mousa* and Mr. Elishis, the court concludes that Mr. Elishis is

entitled to recover compensatory damages for his past and future pain and suffering in the amount of $12,000,000, the same amount as the plaintiff in *Mousa* received. *Id*. at *33.

Mr. Elishis has also requested damages for his past medical expenses and has "reasonably proven" these expenses through the testimony of his mother. *Hill*, 328 F.3d at 684-85. Thus, the court concludes that Mr. Elishis is entitled to an award of $10,882.87 for past medical expenses.

### (3) Gregg Salzman

Mr. Salzman suffered severe burns and blast injuries including a perforated eardrum and a shrapnel wound to his upper lip. His permanent injuries – severe nerve damage that causes chronic pain, debilitating headaches and PTSD – are not as severe as those of Ms. Mousa. *Mousa*, 2001 U.S. Dist. LEXIS 24316, at *10-14. In contrast to Ms. Mousa's injuries, Mr. Salzman's injuries, although serious, did not completely change his life. *Id*. He continues to work as a chiropractor, although in a permanently limited capacity. Also in contrast to the plaintiff in *Mousa*, Mr. Salzman was hospitalized for about one week while Ms. Mousa was hospitalized for about four weeks. *Id*. at *11. Taking into account Mr. Salzman's pain and suffering, which is severe but slightly less severe than that of Ms. Mousa, the court concludes that Mr. Salzman is entitled to recover compensatory damages for his past and future pain and suffering in the amount of $10,000,000, $2,000,000 less than the pain and suffering award in *Mousa*. *Id*. at *33.

.

### (4) Jenny Rubin

In contrast to Ms. Mousa, Ms. Rubin did not require hospitalization after the bombing because she had no apparent physical injuries. *Id*. at \*10-14.  Like Ms. Mousa, Ms. Rubin suffers from PTSD and concentration disruptions. *Id*.  Taking into account that Ms. Rubin's injuries are significantly less severe than those of Ms. Mousa, the court concludes that Ms. Rubin is entitled to recover compensatory damages for her past and future pain and suffering in the amount of $7,000,000.  This amount is $5,000,000 less than the pain and suffering award in *Mousa*. *Id*. at \*33.

### (5) Daniel Miller

Similar to Ms. Mousa, Mr. Miller suffered severe blast injuries including multiple shrapnel wounds to his legs and left eye and his permanent injuries include a hematoma in his left leg, a permanent limp in his right leg, difficulty walking, permanent hypersensitivity to sunlight, nerve damage to his fingers and hands, and PTSD. *Id*.  Also like Ms. Mousa, Mr. Miller received medical treatment for about five weeks. *Id*.  Taking into account the similar degree of pain and suffering between Mr. Miller and the plaintiff in *Mousa*, the court concludes that Mr. Miller is entitled to recover compensatory damages for his past and future pain and suffering in the same amount as Ms. Mousa received, $12,000,000. *Id*. at \*33.

### (6) Abraham Mendelson

Similar to Ms. Mousa, Mr. Mendelson suffered severe burns and blast injuries including a perforated eardrum, a partially severed right ear, partial hearing loss, tinnitus, large scars, chronic headaches, and PTSD. *Id*.  Although Mr. Mendelson was hospitalized for only four days, compared to Ms. Mousa's four weeks, Mr. Mendelson

underwent burn therapy for about a month after leaving the hospital.  *Id.*  Taking into account the similar degree of pain and suffering between Mr. Mendelson and the plaintiff in *Mousa*, and focusing on both plaintiffs' severe burns, the court concludes that Mr. Mendelson is entitled to recover compensatory damages for his past and future pain and suffering in the amount of $12,000,000, the same amount as the plaintiff in *Mousa* received.  *Id.* at *33.

### (7)  Stuart Hersh

Similar to Ms. Mousa, Mr. Hersh suffered severe burns and blast injuries including a 60 percent hearing loss, tinnitus, back pain, chronic ear infections, burn scars, difficulty walking, PTSD, and psychomotor retardation.  *Id.*  Although Mr. Hersh was hospitalized only one day, compared to Ms. Mousa's four weeks, Mr. Hersh's permanent injuries are similar in type and severity to Ms. Mousa's permanent injuries.  *Id.*  Taking into account the similar degree of pain and suffering between Mr. Hersh and the plaintiff in *Mousa*, the court concludes that Mr. Hersh is entitled to recover compensatory damages for his past and future pain and suffering in the amount of $12,000,000, the same amount as the plaintiff in *Mousa* received.  *Id.* at *33.

### (9)  Noam Rozenman

Similar to Ms. Mousa, Mr. Rozenman suffered severe burns and blast injuries, including tinnitus, perforated eardrums, chronic ear infections, scars, nerve damage in his left leg and right hand, and PTSD.  *Id.*  In contrast to Ms. Mousa's four weeks of hospitalization, Mr. Rozenman spent six weeks in the hospital, and underwent additional surgeries a year after the bombing.  *Id.*  Also in contrast to the plaintiff in *Mousa*, Mr. Rozenman's extreme and severe burn injuries required ongoing painful treatment.  His

higher degree of pain and suffering suggests a damages award greater than the award in *Mousa*. Taking into account the differences in pain and suffering between the plaintiff in *Mousa* and Mr. Rozenman, the court concludes that Mr. Rozenman is entitled to recover compensatory damages for his past and future pain and suffering in the amount of $15,000,000, $3,000,000 more than the pain and suffering award in *Mousa*. *Id*. at *33.

### b. The Plaintiffs Not Present at the Bombing

The defendants' extreme and outrageous conduct – the September 4, 1997 bombing – caused mental grief and anguish to those plaintiffs who are close to the bombing victims, but who were not present at the bombing. *Surette*, 213 F. Supp. 2d at 269-70.

### (1) Deborah Rubin

Deborah Rubin suffers grief and anguish as a result of her daughter Jenny Rubin's injuries caused by the bombing. Because Deborah Rubin has a parent-child relationship with Jenny Rubin and because Jenny Rubin is a surviving terrorism victim, the court applies the reasoning in *Acree*. *Acree,* 2003 WL 21537919, at *43. Similar to the parent-plaintiffs in *Acree*, Ms. Rubin suffers severe mental anguish from the physical and emotional changes to Jenny Rubin caused by the bombing. *Id*. Unlike the victims in *Acree*, Ms. Rubin's daughter was not taken hostage. *Id*. Taking into account both the parent-child relationship and the grief and anguish Ms. Rubin suffers, and recognizing that Ms. Rubin did not suffer any hostage-taking separation from her daughter, the court concludes that Ms. Rubin is entitled to recover compensatory damages for solatium in the amount of $2,500,000.

### (2)  Renay Frym

Renay Frym suffers from grief and mental anguish as a result of Stuart Hersh's injuries as caused by the bombing.  Like the spouse-plaintiffs in *Cicippio* and *Acree*, as a result of the bombing, Ms. Frym suffers ongoing mental anguish, regards herself as more a nurse than a wife to her spouse, and has no marital relations with her husband. *Cicippio*, 18 F. Supp. 2d at 66-67; *Acree*, 2003 WL 21537919, at *42-43.  Unlike the surviving victims in *Cicippio* and *Acree*, Ms. Frym's spouse was not taken hostage.  *Id*. Taking into account the severity of Ms. Frym's husband's permanent injuries, Ms. Frym's suffering which is similar to that of the surviving hostages' wives in *Cicippio* and *Acree*, and recognizing that Ms. Frym did not suffer any hostage-taking separation from her husband, the court concludes that Ms. Frym is entitled to recover compensatory damages for solatium in the amount of $6,000,000.

### (3)  Elena Rozenman

Elena Rozenman suffers from grief and anguish due to Noam Rozenman's injuries as caused by the bombing.  Because Ms. Rozenman has a parent-child relationship with Noam Rozenman and because Noam Rozenman is a surviving terrorism victim, the court applies the reasoning in *Acree*.  2003 WL 21537919, at *43.  Similar to the parent-plaintiffs in *Acree*, Ms. Rozenman suffers severe mental anguish from the physical and emotional changes to Noam Rozenman as caused by the bombing.  *Id*. Unlike the terrorism victims in *Acree*, Ms. Rozenman's son was not taken hostage.  *Id*. Taking into account both the parent-child relationship and the grief and anguish Ms. Rozenman suffers, and recognizing that Ms. Rozenman did not suffer any hostage-taking

separation from her son, the court concludes that Ms. Rozenman is entitled to recover compensatory damages for solatium in the amount of $2,500,000.

### (4) Tzvi Rozenman

Tzvi Rozenman suffers grief and mental anguish due to Noam Rozenman's injuries as caused by the bombing. Because Mr. Rozenman has a parent-child relationship with Noam Rozenman and because Noam Rozenman is a surviving terrorism victim, the court applies the reasoning in *Acree*. 2003 WL 21537919, at *43. Similar to the parent-plaintiffs in *Acree*, Mr. Rozenman suffers severe mental anguish from the physical and emotional changes to Noam Rozenman caused by the bombing. *Id*. Unlike the terrorism victims in *Acree*, Mr. Rozenman's son was not taken hostage. *Id*. Taking into account both the parent-child relationship and the grief and anguish Mr. Rozenman suffers, and recognizing that Mr. Rozenman did not suffer any hostage-taking separation from his son, the court concludes that Mr. Rozenman is entitled to recover compensatory damages for solatium in the amount of $2,500,000.

### C. Punitive Damages

### 1. Legal Standard for Punitive Damages

In addition to compensatory damages, pursuant to the FSIA, courts also have "the power to award punitive damages against an agency or instrumentality of a foreign state in a case brought under section 1605(a)(7)." *Kilburn v. Republic of Iran*, 2003 U.S. Dist. LEXIS 14347 (D.D.C. Aug. 8, 2003); *Cronin*, 238 F. Supp. 2d at 235 (citing 28 U.S.C. § 1606). In previous FSIA cases, courts treated MOIS as an agent or instrumentality of Iran and awarded punitive damages against MOIS and Iranian officials. *E.g.*, *Stern v. Islamic Republic of Iran*, 2003 WL 21670671, at *14 (D.D.C. July 17, 2003) (awarding

$300,000,000 in punitive damages against MOIS, Ayatollah Ali Hoseini Khamenei, Ali

Akbar Hashemi-Rafsanjani and Ali Fallahian-Khuzestani); *Cronin*, 238 F. Supp. 2d at

235-36 (awarding $300,000,000 in punitive damages against MOIS); *Surette*, 231 F.

Supp. 2d at 273-74 (noting that "the FSIA expressly exempts a foreign state from liability

for punitive damages, but permits punitive damages to be assessed against an 'agency or

instrumentality' of a foreign state").

Recently, in ruling on a preliminary issue not related to damages, the D.C. Circuit

determined that "if the core functions of the entity are governmental, it is considered the

foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign

state." *Roeder*, 2003 WL 21495184, at *5.  Applying this categorical approach, the court

stated that Iran's Ministry of Foreign Affairs has a core governmental function, and thus,

"must be treated as the state of Iran itself rather than as its agent." *Id*.  In *Kilburn*, this

member of the court recently considered *Roeder* and determined that *Roeder*'s

categorical approach does not apply to the issue of punitive damages in FSIA cases.

*Kilburn*, No. 01-1301, at 30.  This outcome was appropriate because in *Roeder*, the D.C.

Circuit did not set forth the categorical approach in the context of punitive damages.  *Id*.

at 30.  Thus, rather than break with the long line of FSIA cases that assessed punitive

damages against MOIS as an agency or instrumentality of Iran, this court follows the

precedent of the previous punitive damages awards against MOIS. *E.g.*, *Stern*, 2003 WL

21670671, at *14; *Cronin*, 238 F. Supp. 2d at 235-36.

Courts award punitive damages to plaintiffs who are direct victims of terrorism

and their estates, but not to plaintiffs who are family members of surviving terrorism

victims.  *Stern*, 2003 WL 21670671, at *15;  *Acree*, 2003 WL 21537919, at *43-44;

*Eisenfeld*, 172 F. Supp. 2d at 9. In addition, because punitive damages are intended to punish the defendants for the terrorist act itself, courts assess a single amount of punitive damages against the defendants for a terrorist act, rather than separate amounts for each plaintiff. *Acree*, 2003 WL 21537919, at *44 (awarding $306,000,000 in punitive damages to be shared equally among 17 prisoners of war); *Cronin*, 238 F. Supp. 2d at 235-36 (awarding to the single victim $300,000,000 in punitive damages); *Eisenfeld*, 172 F. Supp. 2d at 9 (rejecting the plaintiffs' request for two separate punitive damages awards – one for each deceased terrorism victim's estate – and awarding a single amount of $300,000,000 in punitive damages, "given that their deaths resulted from the same act of terrorism").

Turning to the appropriate amount of punitive damages, courts consider four factors: "[1] the character of the defendants' act, [2] the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, [3] the need for deterrence, and [4] the wealth of the defendants." *Acree*, 2003 WL 21537919, at *43 (citing *Flatow*, 999 F. Supp. at 32). In consideration of these factors, courts have used a multiple of three times Iran's annual expenditure on terrorism and consequently have generally awarded $300,000,000 in punitive damages per terrorist incident. *E.g.*, *id.* at 44; *Stern*, 2003 WL 21670671, at *14-15; *Cronin*, 238 F. Supp. 2d at 235-36; *Eisenfeld*, 172 F. Supp. 2d at 9.

### 2. Conclusions of Law Regarding Punitive Damages

The court determines that the plaintiffs may seek punitive damages against all of the defendants except Iran and that the court has the power to award punitive damages pursuant to the FSIA. *Stern,* 2003 WL 21670671, at *14-15. Considering the first factor for the punitive damages determination, the court determines that the character of the

bombing is extremely heinous. *Acree*, 2003 WL 21537919, at *43. The defendants'

demonstrated policy of encouraging, supporting and directing a campaign of deadly

terrorism is evidence of the monstrous character of the bombing that inflicted maximum

pain and suffering on innocent people. Killing innocent civilians for political ends

constitutes unconscionable conduct in any civilized society. *E.g.*, *Cronin*, 238 F. Supp.

2d at 235.

Second, the nature and extent of the harm to the plaintiffs is obvious from the

evidence of the devastating and permanent physical and emotional injuries suffered by

the plaintiffs. *Acree*, 2003 WL 21537919, at *43. The plaintiffs' physical injuries are

severe and their ongoing emotional damages only compound the severity of the physical

injuries. The defendants caused, and intended to cause, these injuries by packing the

bombs with metal pieces and chemicals.

Third, the court recognizes that "[p]unitive damages are particularly appropriate

in seeking to deter terrorist states from engaging in the heinous acts designated for §

1605(a)(7) actions, including . . . extrajudicial killing." *Id.* at *44. The court determines

that only a large amount of punitive damages can serve as an effective deterrent against

future terrorist acts. *Stern*, 2003 WL 21670671, at *14.

Fourth, expert testimony at the trial showed that MOIS has a substantial amount

of funds at its disposal and courts in this circuit have consistently recognized MOIS's

wealth in prior FSIA cases. *Acree*, 2003 WL 21537919, at *43; *see also, e.g., Weinstein*,

184 F. Supp. 2d at 25 (noting that MOIS is the largest intelligence agency in the Middle

East, with approximately 30,000 employees and an annual budget between $100,000,000

and $400,000,000); *Cronin*, 238 F. Supp. 2d at 236 (awarding punitive damages based on the "approximately $100 million [spent] each year in support of . . . terrorist activities").

Consistent with the longstanding precedent of this court, the court applies the multiple of three times Iran's annual expenditure on terrorism to award punitive damages against all defendants, except for Iran, jointly and severally in the amount of $300,000,000, to be shared equally among the eight plaintiffs present at the bombing and resulting in $37,500,000 for each plaintiff present at the bombing. *E.g.*, *Stern*, 2003 WL 21670671, at *14; *Acree*, 2003 WL 21537919, at *44.

## IV. CONCLUSION

For the foregoing reasons, the court finds and concludes that the plaintiffs have established their right to relief and enters default judgments against the defendants. For each of these two consolidated actions, an Order and Judgment directing the parties in a manner consistent with these Findings of Fact and Conclusions of Law is separately and contemporaneously issued this *10th* day of September, 2003.

Ricardo M. Urbina
United States District Judge